### APPEAL OF PARISH-WATSON & CO., INC.

Docket No. 2833.    Submitted June 18, 1925.    Decided October 16, 1925.

> 1. Upon incorporation of a joint venture, a portion of the property acquired by the corporation was transferred to it at cost to the joint venturers under a written agreement which provided that the net profits arising from the sale of such property, irrespective of any dividends upon the capital stock of such corporation resulting from other business, should be paid to the joint venturers. *Held*, that such net profits constituted taxable income of the individuals and not of the corporation.
>
> 2. Profits arising from a sale of property, *held* to have been income for the taxable year 1918.

*Lawrence A. Baker, James H. Hayes*, and *Thomas R. Rutter, Esqs.*, for the taxpayer.
*Willis D. Nance, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

#### FINDINGS OF FACT.

The taxpayer is a New York corporation, with principal office and place of business in New York City, engaged in the business of

buying and selling antique porcelains, paintings, tapestries, and other art objects.

For several years prior to 1917, Michael Dreicer, Jacob Dreicer, and W. D. N. Perine, partners in the jewelry business under the name of Dreicer & Co., were, in company with one M. Parish-Watson, an employee of Dreicer & Co., engaged in buying and selling art collections. This business was carried on by the four men named as a joint venture separate and distinct from the business of Dreicer & Co. Early in the year 1917 it was decided to incorporate the joint venture and to make it a permanent business. Accordingly, about February 1, 1917, steps were taken to organize a corporation to take over the business of the joint venturers, as a result of which a corporation called " Tapesart, Inc.," was formed. The joint venturers, however, decided later that M. Parish-Watson's name should be used in the corporation, as it was known to those who purchased objects of art for themselves or as dealers therein. No shares, therefore, of stock of " Tapesart, Inc.," were ever issued and a corporation known as " Parish-Watson & Co., Inc.," the corporation herein, was organized under the laws of the State of New York with an authorized capital of $1,000,000, divided into 10,000 shares of common stock of the par value of $100 each. Before the first meeting of the stockholders of the corporation was held it was deemed advisable by the incorporators to take advantage of a statute recently enacted by the Legislature of the State of New York, providing for the reclassification of the stock of corporations. In order to do so it became necessary to file a certificate of reorganization. Therefore, upon instructions received from the Attorney General of New York, the incorporators, the four joint venturers referred to herein, caused to be issued to themselves 10 shares of the original common stock of the corporation, for which they paid $1,000. The first meeting of the stockholders was held on October 16, 1917, at which a proposed form of certificate of reorganization was presented to and adopted by the stockholders, and such certificate was duly filed and recorded in the office of the Secretary of State of the State of New York on October 19, 1917. The certificate of reorganization provided that the stock of the corporation should consist of 10,000 shares of preferred stock of the par value of $100 each, and 1,000 shares of common stock of no par value. The dividends on the preferred stock were fixed at 6 per cent per annum.

At the time it was decided to form the new corporation the property owned and jointly held by the joint venturers consisted of accounts receivable, good will, and an undivided one-half interest in certain merchandise, consisting of art collections, the other one-half of such merchandise being owned by outside interests which are not, and have never been, in any way connected with the taxpayer cor-

poration.  Between February 1, 1917, and October 16, 1917, considerable discussion arose between the four joint venturers as to the disposal of the art collections, in which, as above stated, they owned equal shares of an undivided one-half interest.  Michael Dreicer and M. Parish-Watson took the position in respect to the ownership of the no-par value common stock of the new corporation that, as they were to be the active members of a new corporation, they should have an interest of 35 per cent each and that Jacob Dreicer and William D. N. Perine should each have only 15 per. cent of the common stock.  The only way in which they could induce Perine to agree to such percentage was on the basis that the undivided one-half interest in the art collections referred to, owned by the four joint venturers, should be transferred to the new corporation at the cost thereof to them, with the reservation and agreement that the net profits that might thereafter arise from the sale of the art objects so transferred should be paid over to the four joint venturers in equal shares, the corporation under no circumstances to have any interest in the net profits from the sale thereof.  This arrangement, as stipulated by Perine, was finally adopted by all of the joint venturers and a form of written agreement, hereinafter set forth as the agreement of October 17, 1917, was prepared in order to carry out the intentions of the four joint venturers.

On October 16, 1917, at the first meeting of the stockholders, the form of agreement hereinabove mentioned was presented to them by Jacob Dreicer, Michael Dreicer, William D. N. Perine, and M. Parish-Watson, offering to sell, assign, and convey to the corporation certain assets and property more specifically set forth in the said agreement.  The stockholders thereupon adopted a resolution approving and accepting the offer so made and authorizing and instructing the board of directors of the corporation to adopt the said agreement and to authorize its execution by the proper officers of the company.  On the same day the first meeting of the board of directors of the corporation was held and the following action was taken by them in regard to the agreement referred to, as shown by the minutes of the board of directors:

There was then presented to the meeting a proposed written agreement between Messrs. Jacob Dreicer, Michael Dreicer, William D. N. Perine, M. Parish-Watson and this Company, offering to transfer, convey and assign to the Company, in exchange for capital stock, certain assets and property therein set forth.  The said form of agreement was ordered filed in the Minute Book of the Company.

The President also presented a resolution of the stockholders approving the said agreement and recommending that the Directors authorize the execution of the same, and to take such action, in regard thereto, as might be necessary to make such execution duly effective.

The following resolution was thereupon moved, seconded and unanimously adopted:

" Whereas, the property offered in exchange for capital stock of this Company by Messrs. Jacob Dreicer, Michael Dreicer, William D. N. Perine and M. Parish-Watson in their proposed agreement with this Company is adjudged by this Board to be of the reasonable value of Seven Hundred and Twenty-nine Thousand Dollars ($729,000), and to be necessary for the use and lawful purposes of the Company.

" Now, therefore, be it

" Resolved, That the said property and assets as set forth therein be and hereby are in accordance with the authorization and instructions of the stock-holders of this Company accepted in full payment for stock of the Company, in accordance with the terms of said agreement; and the proper officers of this Company are hereby authorized and directed to execute said agreement in behalf of this Company and to issue capital stock of the Company all fully paid and non-assessable, in the manner designated by said agreement."

The agreement heretofore referred to was executed by the parties concerned on October 17, 1917. It is as follows:

This agreement, made this 17th day of October, 1917, by and between Jacob Dreicer, Michael Dreicer, William D. N. Perine and M. Parish-Watson, parties of the first part and Parish-Watson & Co., Inc., a corporation organized and existing under the Laws of the State of New York, hereinafter referred to as the " Corporation ", party of the second part;

Witnesseth: That for and in consideration of the mutual covenants herein contained and in further consideration of One Dollar by each to the other in hand paid and for other valuable considerations, the receipt of which is hereby acknowledged, the parties hereto do covenant and agree as follows:

First: The parties of the first part agree to and do hereby transfer, assign and set over as of February 1st, 1917, unto the Corporation all their right, title and interest in and to the property, cash, stock on hand, merchandise and accounts receivable, including the Barney Collection, Davies Collection, Sampson Collection, Dreicer Joint Collection, the joint account with Gorer Collection, and all the assets of every kind and nature, including good will, if any, and right to use of name, owned jointly by the parties of the first part in connection with the art business which has been conducted jointly by the parties of the first part at No. 560 Fifth Avenue, Borough of Manhattan, New York City.

It is understood and agreed that Jacob Dreicer, one of the parties of the first part, shall also pay in cash to the Corporation as of February 1st, 1917, the sum of Fifteen Thousand Seventy-three and 75/100 Dollars ($15,073.75).

It is further understood and agreed that from the separate respective right, title and interests, as aforesaid, of the parties of the first part, as of February 1st, 1917, there shall be deducted and paid in cash to the said parties of the first part respectively, certain amounts as follows:

| | |
|---|---:|
| Michael Dreicer | $389. 22 |
| William D. N. Perine | 3, 643. 26 |
| M. Parish-Watson | 3, 834. 95 |

Second: The Corporation agrees to issue and deliver simultaneously with the execution of this agreement its preferred capital stock fully paid and non-assessable in the aggregate amount of Seven Hundred Twenty Thousand Dollars ($720,000) and its common stock fully paid and non-assessable in the aggregate amount of Nine Hundred and Ninety (990) shares to the parties of the first part or their nominees in manner following:

| Name | Pre-ferred | Common |
|------|-----------|--------|
| | | *Share* |
| Jacob Dreicer | $180,000 | 150 |
| Michael Dreicer | 180,000 | 346 |
| William D. N. Perine | 180,000 | 147 |
| M. Parish-Watson | 180,000 | 347 |

Third: The Corporation further agrees that it will segregate and set aside the net profits derived from and which may be earned by sale of all goods and merchandise and stock on hand, owned jointly by the parties of the first part in connection with a similar business previously carried on as a joint venture, and whether owned by the parties of the first part outright or jointly with P. W. French & Co. and others, on February 1st, 1917, and transferred by said parties of the first part to the corporation as of said February 1st, 1917; that it will open a separate account in the name of each of the parties of the first part and will credit and pay the said net profits in equal shares to each of the parties of the first part without including same in, or applying same to, and irrespective of any dividends on the capital stock of the Corporation resulting from other business; that the net profits shall be deemed to be the amount remaining after paying or setting aside or deducting the purchase price of the said goods, merchandise and stock on hand, all direct charges against the goods and all proportionate selling expenses, commissions, overhead charges and current expenses incurred and borne by the Corporation in connection with said certain goods, merchandise and stock on hand transferred to said Corporation as of February 1st, 1917.

Fourth: It is further understood and agreed that the earnings and profits of the business transacted by the Corporation and arising from sales of goods, merchandise and stock on hand acquired by the Corporation as of any date since February 1st, 1917, shall be dealt with by the Corporation and its Board of Directors as may be required by law. * * *

The assets, other than good will, owned jointly by the four persons named herein on October 1, 1917, and turned over by them to the corporation under the agreement of that date were as follows:

ASSETS.

| | | |
|---|---:|---:|
| Accounts receivable | $521,475.29 | |
| Less Gorer share | 108,009.19 | |
| | | $413,466.10 |
| Merchandise: | | |
| Barney | 90,750.00 | |
| Davies | 35,815.00 | |
| Sampson | 84,210.00 | |
| Dreicer, joint | 214,013.78 | |
| Joint account | 30,767.97 | |
| | | 455,556.75 |
| | | 869,022.85 |

LIABILITIES.

| | | |
|---|---|---|
| Accounts payable | | $156,229.17 |
| Capital account: | | |
| Jacob Dreicer | $164,926.25 | |
| Michael Dreicer | 180,389.22 | |
| Wm. D. N. Perine | 183,643.26 | |
| M. Parish-Watson | 183,834.95 | |
| | | 712,793.68 |
| | | 869,022.85 |

The assets had a net value of $712,793.68. The amount of $455,-556.75 under the head of "merchandise," represents the cost to the four joint venturers of their undivided one-half in the several art collections. These assets were turned over to the corporation under the agreement of October 17, 1917, together with sufficient cash to make the total of $720,000 worth of assets, exclusive of good will, and to balance the capital account of the joint venturers at $180,000 each.

Upon the sale of any of the articles of merchandise turned over by the joint venturers to the taxpayer, 50 per cent of the total cost, together with 50 per cent of the net profits, was immediately paid over by the taxpayer to the outside owners of the undivided one-half interest therein; the other 50 per cent of the cost was retained by the taxpayer under the agreement of October 17, 1917, and the other 50 per cent of the net profit was paid over to the joint venturers in equal shares. The payments thus made to the joint venturers amounted to $33,968.32 for the year 1918 and $73,120.77 for the year 1919.

With several exceptions, dividends have been regularly paid on the preferred stock of the corporation since its organization, but no dividend has ever been paid on the common stock.

During the year 1918, one Arthur I. Verney, agent for Morton F. Plant, a wealthy man, informed M. Parish-Watson that Plant, in order to carry out a decorative plan for a new house he was building, would like to put in the house some of the art objects owned by the taxpayer but that Plant could not afford to pay for them at that time. Parish-Watson suggested to Verney that possibly terms could be arranged. Certain selected articles were therefore sent to Plant's house which met with his approval, and terms for the purchase of said articles were finally agreed upon, as evidenced by the following letter from Plant to Parish-Watson & Co., Inc.

MAY 8TH, 1918.

Messrs. PARISH-WATSON & CO., INC.,
        560 Fifth Avenue, New York.
    GENTLEMEN: In acknowledgement of your favor of the 6th instant, enclosing descriptive invoice with terms of payment, covering purchase of porcelains amounting to a total of $190,850, I beg hereby to confirm the purchase and the

terms as noted on the bill, commencing with April 15, 1919, $50,000, and $35,000 on each of the following dates: July 15th, 1919; October 15th, 1919; January 15th, 1920; and a payment of $35,850 on April 15th, 1920.

  Very truly yours,

               M. F. PLANT.

Parish-Watson gave a memorandum of the articles sent to Plant's home to the bookkeeper employed by the taxpayer, who entered the list upon the books, together with the prices, without instruction, however, from Parish-Watson. Early in the year 1919, accountants for the taxpayer came across the entries and upon inquiring of Parish-Watson with respect thereto were informed by him that he did not consider that the sale to Plant was made in the year 1918 and that the bookkeeper should not have entered it as such. The accountants thereupon transferred the entry to the year 1919 and the taxpayer made a return of the profit from the sale in question in its income-tax return for the year 1919 and also paid a sales tax thereon for the year 1919.

Upon audit of the taxpayer's income and profits-tax returns for the years 1918 and 1919, the Commissioner determined that the amounts of $33,968.32 and $73,120.77, paid by the taxpayer to the four joint venturers in the years 1918 and 1919, respectively, as hereinabove set forth, were profits of the corporation and not profits belonging to the four joint venturers; and that the profit realized by the taxpayer on the sale to Plant, amounting to $61,268.75, should be returned as income for the year 1918 instead of for the year 1919.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 10 days' notice, under Rule 50.

### OPINION.

LITTLETON: The first question raised by this appeal is whether the profits arising from the sale of the interest of the joint venturers in the several art collections transferred by them to the taxpayer corporation were income to them or to the taxpayer.

The evidence discloses that, prior to the organization of the taxpayer corporation, the four men named in the findings of fact were engaged in a joint venture and owned in equal shares an undivided one-half interest in several art collections. They also owned, in equal shares, accounts receivable and good will. It was decided by them to incorporate the joint venture and make it a permanent business, and, after considerable discussion, they agreed among themselves that the tangible assets of the business should be turned in to

the corporation for preferred stock and that the common stock of the corporation should be issued for the good will of the old business and divided among the four joint venturers, not in proportion to their interest in the joint venture but according to their estimated future value to the corporation. One of the four joint venturers consented to that division of the common stock only on the condition that their undivided one-half interest in the several art collections should be transferred to the corporation at its cost to them, and that, upon the sale thereof, the net profits therefrom should be divided among the four venturers in equal shares, the corporation under no consideration to have any interest in the profits of the sale. A written agreement, designed to carry out the oral agreement and understanding between the joint venturers, was entered into by them and the corporation, whereupon they transferred to the corporation the accounts receivable together with their interest in the several art collections. The net value of the tangible assets so transferred to the corporation had a value of $712,793.68, including, at cost, the undivided one-half interest of the joint venturers in the art collections. The joint venturers added to that amount sufficient cash to bring the total amount paid in to the corporation to $720,000, and to equalize their interest therein at $180,000 each, and in exchange therefor they received preferred stock of the corporation of the par value of $720,000, which was divided among them in equal shares. The common stock of the corporation was issued for the good will of the joint venture and $1,000 in cash, and was divided among the joint venturers in unequal shares. As the several art collections were sold, one-half of the sale price less cost of selling was turned over to the parties who owned an undivided one-half interest therein, and an amount equal to the cost to the joint venturers of their undivided one-half interest was retained by the corporation and the remainder · thereof, representing the profits from their one-half interest, was paid over to them in equal shares. The payments thus made to them amounted to $33,968.32 in the year 1918 and $73,120.77 in the year 1919.

It is our opinion that the profits in question were, and were intended to be, income to the four joint venturers, and that they did not at any time belong to the corporation. The joint venturers purchased, with the tangible assets of their business and some cash, preferred stock of the corporation of the par value of $720,000, for which they intended to pay only $720,000. They turned over cash, accounts receivable, and their undivided one-half interest in the art collection at cost. The cost of their interest in the art collection, added to the accounts receivable and cash paid in, amounted to $720,-000, and it was intended by them, and the contract so provided, that

upon the sale of the art collection the corporation should retain only an amount equal to the cost to the joint venturers of their interest therein. Upon the sale of the entire collection and the retention by the corporation of an amount equal to the cost to the joint venturers of their interest therein, the corporation would have received for its preferred stock the amount of $720,000. If, as contended by the Commissioner, the profits involved herein belonged to the corporation, the four men named would not have had an equal interest therein, since they owned unequal amounts of the common stock of the corporation, and any excess of earnings over the amount necessary to pay dividends on the preferred stock would have been available to pay dividends on the common stock, which is the thing they desired to avoid. It was not intended that the corporation should retain or have any interest in the proceeds of the sales of the several art collections in excess of the amount of $455,556.75, the cost to the joint venturers of their interest therein, and it was this for which the contract provided. The profits in question were clearly income to the individuals, and did not at any time belong to the corporation. The Commissioner was therefore in error in taxing them as income to the corporation.

The second question presented is whether the profits arising from the sale of certain art objects to one Morton F. Plant, as set forth in the findings of fact, were income to the taxpayer in the year 1918 or in the year 1919. The Commissioner contends that they were income for the year 1918. In its petition the taxpayer raised the point that the sale was one on the installment plan and that the profits arising therefrom should be allocated to the several payments. It abandoned that contention, however, at the hearing. It reported the profits in question as income for the year 1919 and now contends that they were in fact income for that year. The amount of the profits involved is conceded to have been $61,268.75.

We are of the opinion, upon consideration of the evidence presented, that the position of the Commissioner as to this point is correct and should be approved. The transaction was clearly a sale of merchandise in the year 1918. The art objects were delivered to Plant and the terms of purchase were communicated to him in writing. On May 8, 1918, he wrote to the taxpayer that " I beg hereby to confirm the purchase," and contracted to pay certain amounts of money at certain specified dates in accordance with the proposition made to him by the taxpayer. The transaction was completed so far as the taxpayer was concerned and, in the event of Plant's failure to make payment, as set forth in his letter of May 8, 1918, the taxpayer could not have repossessed the art objects, but would have been limited to an action to enforce payment under the

contract to pay. The transaction was a completed sale in the year 1918, and, as the taxpayer kept its books of account on the accrual basis, the sale price was properly accruable in that year. We hold, therefore, that the profits arising from the sale in question were income to the taxpayer in the year 1918.

ARUNDELL not participating.